# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 2850 | DATE | 5/15/2003 |
| CASE TITLE | Heartland Rail Corp. v. Railroad Development Corp. | | |

MOTION:

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, Defendant's motions for summary judgment [8-1][46-1] are granted in part and denied in part. Summary judgment is GRANTED as to Counts I and III of the Complaint and Second Amended Complaint. Summary Judgment is DENIED as to Count II of the Second Amended Complaint. Defendant's motion to dismiss [42-1] is DENIED.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAY 1 9 2003 | 76 |
| ✓ | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| jar/lc | courtroom deputy's initials | ED-7 FILED FOR DOCKETING 03 MAY 15 PM 2: 44 Date/time received in Central Clerk's Office U.S. DISTRICT COURT | date mailed notice mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HEARTLAND RAIL CORPORATION | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | No. 02 C 2850 |
| v. | ) | |
| | ) | HONORABLE DAVID H. COAR |
| RAILROAD DEVELOPMENT CORPORATION, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

## MEMORANDUM OPINION AND ORDER

There are several motions pending and fully briefed before the Court in this case. The case originally came before this Court when, on April 19, 2002, Defendant Railroad Development Corporation ("RDC" or "Defendant") removed Plaintiff Heartland Rail Corporation's ("Heartland" or "Plaintiff") declaratory judgment action from state court. The basis for removal was diversity of the parties, which establishes federal jurisdiction pursuant to 28 U.S.C. § 1332. Defendant RDC answered Plaintiff's Complaint and filed a counterclaim on April 30, 2002. In near record time, Defendant RDC filed a summary judgment motion on June 4, 2002. Since then, that motion has been fully briefed and Plaintiff RDC has filed two amended complaints. The first amended complaint was filed without objection on August 19, 2002. The first amended complaint contained substantially the same allegations as the original complaint, (Def. Resp. Pl. Mot. Leave File First Am. Comp., at 1), though it was styled differently to reflect

1

76

its original filing in federal court. On December 10, 2002, Plaintiff obtained leave to file its second amended complaint, which contained three additional counts.

On January 13, 2003, Defendant filed a Motion to Dismiss portions of Plaintiff's Second Amended Complaint. On January 31, 2003, Defendant filed a Motion for Summary Judgment on the newly asserted claims in Plaintiff's Second Amended Complaint. At this point, all three of Defendant's Motions are before the Court, the initial motion for summary judgment (which the Court permitted RDC to renew as to the same allegations in the Second Amended Complaint), the motion to dismiss the Second Amended Complaint, and the subsequent motion for summary judgment on the newly asserted claims.

## Factual and Procedural Background[1]

Plaintiff/Counter-Defendant Heartland Rail Corporation is incorporated under the laws of Iowa with its principal place of business in Iowa City, Iowa. Since 1996, Archer Daniels Midland Company ("ADM") has controlled Heartland and currently owns over 57 percent of Heartland's common stock. Defendant/Counter-Plaintiff Railroad Development Corporation is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.

The dispute between the parties centers on the fair market value of a corporation, the Iowa Interstate Railroad, Ltd, in which the parties are the sole shareholders. The Iowa Interstate Railroad, Ltd., or "IAIS",[2] operates a rail freight carrier between Chicago, Illinois and Council Bluffs, Iowa. In 1984, Heartland purchased certain operating assets used by IAIS, including track

---

[1]Unless otherwise indicated, these facts come from the facts that both parties agree are undisputed.

[2]This is the parties' abbreviation for this corporation. The Court adopts it for the sake of convenience.

structure, real estate, trackage rights, rights-of-way, shops, and buildings. The parties refer to these assets collectively as "the Properties." The cash consideration that Heartland's shareholders paid to purchase the railroad and associated properties was approximately $5.6 million. To make up the balance of the purchase price, which the Second Amended Complaint alleges at $31 million, Heartland assumed debt that was owed to the Iowa Rail Finance Authority. Heartland leased the railroad to IAIS, and IAIS has operated it since that time. The debt payments were to be made from IAIS lease payments.

### 1. The Option Agreement Between RDC and Heartland

In 1991, Heartland acquired IAIS for $390,000 in cash and 264 shares of stock. RDC presently owns or controls 19.9 percent of the outstanding common stock of the IAIS, and Heartland presently owns or controls the remaining 80.1 percent of the outstanding common stock. RDC gained control of its share of the IAIS common stock in a transaction consummated on August 2, 1991. As part of that transaction, RDC and Heartland entered into an Option Agreement, which granted RDC options to acquire up to 100 percent of the controlling stock, including "all of the stock of the IAIS held by Heartland." (Pl. Compl. Ex. D, at 1.)[3] On the same day as RDC and Heartland entered into the Option Agreement, the IAIS and Heartland entered into an Amended and Restated Lease Agreement ("Lease Agreement"). The Lease Agreement provided that if RDC exercised its option to purchase the IAIS stock held by

_____

[3]RDC included Plaintiff's original complaint and the exhibits annexed thereto as Exhibit 1 in its "Exhibits in Support of RDC's Motion for Summary Judgment." Rather than seek a satisfactory abbreviation for an exhibit that itself contains exhibits, the Court will simply abbreviate it as Plaintiff's Complaint (Pl. Comp.) with the accompanying exhibit letter.

Heartland, then the IAIS "shall have an option to purchase" the Properties. (Pl. Compl. Ex. A, §10.01, at 18.)

On August 12, 1993, both the Lease Agreement and the Option Agreement were amended between the parties. The First Amendment to the Option Agreement provided that if RDC acquired more than 50 percent of the common stock of IAIS, then RDC had to direct IAIS to acquire the Properties from Heartland under its option in the lease, as amended.

## 2. The First post-Option Valuation of the IAIS, March 1995

In 1995, Arthur Andersen was retained to perform a valuation of the Fair Market Value of IAIS. This was the first valuation of the Railroad undertaken subsequent to execution of the Lease, Option, and First Amendments to both the Lease and Option, although it was not undertaken pursuant to those agreements. At Arthur Andersen, Norman Carlson was the partner in charge of the 1995 valuation, and Theresa Poppei was the engagement manager who would "coordinate both the technical and administrative aspects of the engagement." (RDC Appendix Evi. Supp. Mot. Summ. J. Heartland's Newly-Asserted Claims, Vol. II, DX 29, at 7.) On July 27, 1995, Poppei presented the results of the valuation to the Heartland Board of Directors. Arthur Andersen concluded that, as of March 31, 1995, the "current railroad operations" were valued between $2.6 million and $3.3 million. (RDC Appendix Evi. Supp. Mot. Summ. J. Heartland's Newly-Asserted Claims, Vol. II, DX 3, at 3.)[4]

On April 29, 1996, both the Lease Agreement and the Option Agreement were amended yet again, shortly after ADM acquired control of Heartland. The parties dispute whether the

---

[4]For the purposes of this valuation, it was assumed that IAIS owned all of its operating assets, i.e. the railroad properties. (RDC 2d Statement Uncontested Facts, ¶ 59)

terms of the Second Lease Amendment superseded the terms of the First Lease Amendment. The parties do not dispute that the Option Agreement, as amended, is a valid, binding, and enforceable contract.

As amended by the Second Option Amendment, the Option Agreement provides "upon RDC's exercise" of its option to purchase the stock of the IAIS, the IAIS option to purchase the Properties set forth in the Lease Agreement, as amended, shall be deemed exercised. The net effect of the Second Option Amendment was to grant RDC an option to purchase from Heartland both the stock of the IAIS and the Properties.

The Second Option Amendment states "the purchase price of the Common Stock to be acquired by RDC and the 'Properties' to be acquired by IAIS shall be the 'Fair Market Value' as a going concern on a consolidated basis as that term is defined hereafter." (Pl. Comp., Ex. F, at 2.) The going concern/consolidated basis language was inserted into the agreement at the behest of ADM's attorney. The Second Option Amendment further defined the term "Fair Market Value" to mean "(i) the amount that the parties agree is the fair market value . . . or (ii) in the event that the parties are unable to agree as to such value, the amount determined in accord with the . . . 'Appraisal Process'" defined therein. (Pl. Comp., Ex. F at 2.)

3.     **The Appraisal Process**

The appraisal process prescribed by the Second Option Amendment contemplates the completion of up to three appraisals. Pursuant to the Appraisal Process, RDC and Heartland would "each appoint an independent appraiser to value the Common Stock and the 'Properties.'" Id. Each appraiser would then deliver its "opinion in writing stating the fair market value of Common Stock and the 'Properties.'" Id. If the two appraisals were within 10 percent of one

another, the "Fair Market Value will be the average of the two appraisals." Id. If the appraisals differed by more than 10 percent, "the two appraisers will themselves appoint a third appraiser." Id. The third appraiser was then charged with "determin[ing] independently [the] Common Stock's and the 'Properties' Fair Market Value." Id. If the third appraisal became necessary, the agreement provided that the fair market value of the property would be calculated by the mean of the median of the three appraised values and whichever of the two remaining values is closest to such median. Id.[5] If the third appraisal is completed, the outlying appraisal (neither the median nor next closest to the median) is disregarded and has no effect on the Railroad's final Fair Market Value.

On July 3, 2001, RDC notified Heartland that it was exercising the option under the Option Agreement, as amended, to purchase the Stock. This triggered IAIS's option to purchase the Properties. RDC and Heartland were unable to agree on a fair market value of the Stock and the Properties. On September 20, 2001, Heartland invoked the appraisal process set forth in the parties' agreement to determine the fair market value. At a meeting of the Iowa Railway Finance Authority on December 13, 2001, that was also attended by Heartland's General Counsel, RDC's Chairman stated RDC's belief that at the end of the appraisal process, "We [RDC] are contractually locked in as to the final price." (RDC DX 103) Heartland did not object to that characterization at the meeting or subsequently.

---

[5]In other words, the parties would have three numbers: they would each have their own appraiser's figure, and then they would have the third appraiser's figure. They would take the middle number (whichever appraisal it happened to be) and whichever number was closest to the middle number, add them together and divide by two.

As set forth in the appraisal process, the parties each obtained their own independent appraisers. RDC appointed R.L. Banks & Associates to be its independent appraiser, and Heartland appointed L.E. Peabody & Associates to be its appraiser. In mid-October 2001, the appraisers produced their respective appraisals. Banks' appraisal for RDC concluded that the Fair Market Value of the Stock and the Properties "as a going concern on a consolidated basis" was $1,616,000. (Pl. Comp., Ex. J, at 3.) Peabody's appraisal for Heartland resulted in three figures for the Fair Market Value of the Stock and the Properties: "based on the Net Liquidation Value of Heartland's Rail Properties" was $51,000,000 (Pl. Comp., Ex. I at 5); "as a going concern on a consolidated basis . . . using a Present Value of Future Cash Flow approach" it was $37,500,000 (Pl. Comp., Ex. I at 6); "as a going concern on a consolidated basis . . . using a Revenue and Earnings Multiple approach" it was $34,300,000 (Pl. Comp., Ex. I at 6).

All of Peabody's appraisals for Heartland were more than 10 percent different than Banks' appraisal for RDC, so the appointment of a third appraiser under the process became necessary. On November 2, 2001, the two appraisers agreed to appoint "Norm Carlson and Theresa Poppei together as the third appraiser under the RDC/Heartland agreements." (Pl. Rep. Counterclaim, ¶ 21). Carlson and Poppei were familiar with the companies involved, as they had conducted an appraisal of IAIS for Arthur Andersen in March 1995. Heartland and RDC both signed engagement letters with Poppei and Carlson that defined the terms of the third appraisal. Poppei and Carlson sent to RDC and Heartland an engagement letter stating that they would serve "as the independent third appraiser as defined in the Second Amendment to the Option Agreement, dated April 29, 1996 between the [parties]." The parties retained Poppei and Carlson to "provide [their] opinion . . . of the fair market value, on a going concern basis" of the

7

Stock and the Properties " on a consolidated basis." Neither party objected to Poppei and Carlson completing their appraisal as defined in their engagement letter.

In formulating their appraisal, Poppei and Carlson relied on (1) discussions with key members of IAIS management; (2) discussions with RDC's appraiser R.L. Banks; (3) discussions with Heartland's appraiser L.E. Peabody; (4) reviews of investor's expectations of similar companies; and (5) reviews of IAIS's financial statements, performance summaries, and the Option Agreement, as amended. On February 21, 2002, Carlson and Poppei submitted their written appraisal, which concluded that the Fair Market Value of the Stock and the Properties "as a going concern on a consolidated basis" was $9,348,000. (Pl. Comp. Ex. K, at v-i.)

At this point, Heartland cried foul. Each of its Complaints have contested the validity of the third appraisal conducted by Carlson and Poppei. Although the Appraisal Process was concededly complete, Heartland asserts that the flaws in the third appraisal require that there is no "agreed-upon price" for the Stock and the Properties.

If the third appraisal were accepted as valid, under the appraisal process set forth in the Second Option Amendment, the price of the stock and the properties would be $5,482,000. The parties had set April 19, 2002 as the closing date for the transaction. On April 17, 2002, RDC informed Heartland that it was willing to deliver to Heartland a certified or cashier's check in the amount of $5,482,000 in exchange for the common stock certificates and title to the Properties by quit claim deed. Heartland refused to close the transactions for the Stock and the Properties at the offered price, and filed their original complaint for a declaratory judgment in state court.

4.    **Allegations of Failure to Disclose Material Information to the Appraisers**

Heartland's Second Amended Complaint alleges in Count I that RDC had a duty to disclose the terms of its signed a letter of intent to lease the IAIS properties to RailAmerica after acquiring them from Heartland. The parties do not dispute that a non-binding letter of intent was executed between RDC and RailAmerica on June 26, 2001. The letter of intent, by its terms, was not a binding contract and it did "not constitute an agreement to consummate the transaction described herein." (Posner DX15, at 6.). The letter of intent described an agreement that would have generated multi-million dollar revenues for RDC from the lease of IAIS to RailAmerica.

When RDC exercised its option, in July 2001, it informed Heartland and IAIS that RailAmerica would be assisting RDC in the performance of its due diligence. At a meeting of the Iowa Railway Finance Authority ("IRFA") in August 2001, RDC's president disclosed to Heartland's General Counsel and members of the IRFA that RailAmerica would potentially be involved in operating IAIS after RDC acquired the Railroad. Heartland's General Counsel relayed this information to Heartland's Chairman, President, and a member of the Board of Directors. Although Heartland had retained Peabody to be its appraiser at this time, it made no effort to convey any information about a potential transaction with RailAmerica to Peabody.

At a subsequent meeting of the IRFA, RDC's Chairman again disclosed that RDC was in discussions with RailAmerica respecting a potential operating arrangement whereby RailAmerica would operate IAIS after RDC acquired the Railroad. Heartland's General Counsel asserted, "No one from Heartland's perspective would have had any reason to believe or suspect that any such prospective transaction between RDC and RailAmerica would have any impact on the appraised value of the property." (Bannister Dep. Tr. at 321:21–322:1)

5. **Allegations that Carlson was a biased appraiser**

On November 5, 2001, after the appraisers selected Poppei and Carlson to perform the third appraisal but before Poppei and Carlson had been engaged by the parties, Heartland learned from Carlson that he intended to have dinner with RDC representatives in Pittsburgh. About one week later, on November 13, 2001, Carlson sent an email to Heartland and RDC expressing opinions regarding deferred capital expenditures on the Railroad and the value of the Railroad. These two incidents led Heartland to send a letter to RDC dated November 19, 2001, which objected to having Carlson perform the third appraisal. Nonetheless, Heartland subsequently agreed that Poppei would serve as the third appraiser, assisted by Carlson as a railroad consultant. Heartland has subsequently alleged that Carlson was intimately involved with the third appraisal, and that he had a potential financial stake in making a low appraisal.

6. **Heartland's Second Amended Complaint**

Heartland's Second Amended Complaint ("Complaint") contains four counts. Count I of the Complaint requests the Court to set aside all three appraisals conducted during the Appraisal process as invalid because RDC did not disclose to any of the appraisers the substance of its negotiations with RailAmerica and the letter of intent. Count II of the Complaint alleges that the third appraisal, conducted by Popeii and Carlson, is invalid because Carlson failed to disclose that: "(1) he had a business interest in the proposed transaction; (2) he met with RDC's management and had been hired by RDC to assist RDC in its exercise of the Stock Option; and (3) he formed an opinion as to the value of IAIS before being retained as a third appraiser." (Pl. 2nd Am. Comp., ¶ 56.) Count III of the Complaint alleges that the third appraiser's committed "significant, fundamental mistakes" to arrive at their conclusion about the fair market value of

10

IAIS. Count IV of the Complaint asserts that RDC is seeking to obtain certain warranties at closing from Heartland that it is not entitled to receive under the contracts.

## DISCUSSION

### I.    RDC's Motion to Dismiss

RDC has moved to dismiss Count I and portions of Count III of Plaintiff's Complaint under Rule 12(b)(6). The arguments RDC presents in its Motion to Dismiss are largely duplicated in its motion for summary judgment as to Counts I and III. Consequently, the Court will deny the motion to dismiss on those counts and proceed to a determination on the summary judgment motion.

RDC has also moved to dismiss Count IV of Plaintiff's Complaint pursuant to Rule 12(b)(1). In support of its position, RDC argues that the allegations in Count IV are not ripe for adjudication because RDC is not obligated to proceed with purchase of the railroad once the purchase price is established. RDC's position is factually correct, but the absence of an obligation to purchase the railroad does not vitiate ripeness of a declaratory judgment action. In Count IV, Heartland alleges that the parties disagree as to the warranties that might be due at closing. Article III of the Constitution requires a case or controversy to be "'definite and concrete' and to represent a 'real and substantial controversy,' as 'distinguished from a difference or dispute of a hypothetical or abstract character ... [or] an opinion advising what the law would be on a hypothetical state of facts.' Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41 (1934)." Taco Bell Corp. v. Continental Cas. Co., No. 01 C 0438, 2003 WL 124454, at *4 (N.D. Ill. Jan. 13, 2003).

In this case, the duties of the parties at closing is not a dispute of a hypothetical or abstract character. The complaint as originally filed sought a judgment that Heartland did not have to participate in the closing at the price RDC asserts was the "agreed-upon" result of the Appraisal Process. Moreover, RDC filed a counterclaim in this litigation seeking this Court to "order Heartland to sell the Stock and Properties to RDC at the agreed-upon price of $5,482,000 in cash, plus the assumption of certain debts." (Def. Counterclaim at 21.) The dispute between the parties is real, concrete, and ripe for adjudication. Consequently, RDC's Motion to Dismiss Count IV of the Complaint for a lack of ripeness is denied.

## II. RDC's Summary Judgment Motions

RDC has two summary judgment motions fully briefed and pending. The first summary judgment motion was filed on the Plaintiff's original removed Complaint. The Court permitted RDC to proceed without refiling its first summary judgment motion after Heartland filed its First and Second Amended Complaints. After Heartland filed its Second Amended Complaint, RDC filed a second summary judgment motion which sought summary judgment on Count I, Count II, and the portions of Count III that are different from the original complaint. The first summary judgment motion, then, still applies to the bulk of the Second Amended Complaint's Count III. Rather than address the two motions separately, the Court will address RDC's arguments for summary judgment by each Count of Plaintiff's Second Amended Complaint.

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

12

R. Civ. P. 56(c); Kamler v. H/N Telecommunication Services, Inc., 305 F.3d 672, 677 (7th Cir. 2002). A genuine issue of material fact exists for trial when a reasonable jury could return a verdict for the party opposing summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995). When determining whether a genuine issue of material fact exists, the Court considers the evidence and all proper inferences therefrom in the light most favorable to the non-moving party. See Neuma, Inc. v. AMP, Inc. 259 F.3d 864, 871 (7th Cir. 2001). Cases involving the interpretation of contractual documents are often well-suited to disposition on summary judgment. See Neuma, Inc., 259 F.3d at 871; Grun v. Pneumo Abex Corp., 163 F.3d 411, 419 (7th Cir. 1998).

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Michael v. St. Joseph County, et al., 259 F.3d 842, 845 (7th Cir. 2001); Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001). To successfully oppose the motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, see Wolf v. Northwest Ind. Symphony Soc'y, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, see Albiero, 246 F.3d at 932. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose

13

successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250.

## B.     Count I of Heartland's Second Amended Complaint

Count I of Heartland's Complaint turns on whether RDC had a duty to disclose to the appraisers the nature of its negotiations with RailAmerica and the letter of intent that RDC and RailAmerica. The duties that a given contract creates is a legal question of contractual interpretation that is appropriate for summary judgment. See Premier Title Co. v. Donahue, 765 N.E.2d 513, 516 (Ill. App. Ct. 2002) ("The interpretation of a contract is a question of law and therefore may properly be decided on a motion for summary judgment.").

Heartland's position in Count I is that RDC breached an implied covenant of good faith when it did not disclose the terms of its negotiations with RailAmerica. Under Illinois law, which the parties concede applies, "[e]very contract contains an implied covenant of good faith and fair dealing." Northern Trust Co. v. VIII South Michigan Associates, 657 N.E.2d 1095, 1104 (Ill. App. Ct. 1995). The implied covenant of good faith, however, will never supersede or override the explicit terms of a contract between the parties. "Parties to a contract . . . are entitled to enforce the contract to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract." Id.

As discussed above in the factual section, the parties set forth a clear definition and process to establish the fair market value of IAIS. The agreement establishes that the parties, through agreement or the appraisal process, will determine "the 'Fair Market Value' as a going concern on a consolidated basis" of the stock and the IAIS properties. (2d Am. to Option Agreement, § 1.3(b)). The agreement further sets forth that the parties or appraisers shall "rely

upon IAIS' most recent annual, audited financial statements, along with management-prepared, unaudited financial statements" in determining Fair Market Value.  (2d Am. to Option Agreement, § 1,3(d)).

Heartland now takes the position that this contract required RDC to disclose the terms of the letter of intent with RailAmerica because "that transaction provided the best indication of the IAIS' FMV [Fair Market Value]." (Pl. Mem. L. Opp. Def. 2d. Summ. J. Mot., at 6.)  This position is fundamentally flawed.  The contract itself establishes the manner by which the parties would determine IAIS' fair market value, and it is silent as to the role of future transactions in setting that value.  It is entirely possible that RDC, which was operating IAIS under the agreements between the parties, had acquired a level of expertise that would make the corporation more valuable if they exercised the option.  At the time the Second Amendment to the Option Agreement was entered into, however, it was equally possible that RDC would never acquire the skills or cultivate the desire to operate IAIS without Heartland's control.  If the parties wanted to rely upon the value of the corporation after RDC exercised the option in the fair market value determination, they could have readily incorporated such a term in their agreement. They did not do so.  Heartland's efforts to impose a definition of fair market value from anywhere outside of the contract are unavailing.  Where the parties define terms clearly and unambiguously, as they have here, it is the Court's obligation to enforce the contract as written.

Heartland's reliance on Illinois law with respect to fair market value determinations is similarly misplaced.  The principal case that Heartland relies on in support of its position is W.R. Lathom Tool & Machine Co. v. Mutual Leasing Assoc., Inc., 435 N.E.2d 510, 513 (Ill. App. Ct. 1983).  Lathom was a declaratory judgment action where the Plaintiff sought to enforce the

15

unilateral ability to set fair market value pursuant to an option contract that gave the plaintiff sole discretion to set fair market value for the goods. Id. In that case, the Plaintiff set fair market value of the goods at one dollar. Id. at 513. In response, the Illinois Appellate Court interposed a duty of good faith on the party with the sole discretion to set the fair market value. Id.

A critical difference between Lathom and the case at hand is that the contract in Lathom provided no definition of fair market value. In the absence of any contractual indication there, the Illinois courts imputed a duty to set a price that must be "[]related to the market value of the machines. Meaning must be given to the words 'fair market value.'" Lathom, 435 N.E.2d at 512. Here, the parties took it upon themselves to give meaning to the words "fair market value." At the time they amended their option agreement in 1996, they established the appraisal process to determine fair market value. This Court, like courts in Illinois, approves of parties attempting to establish their dispute resolution mechanisms by contract, as it decreases the burden on the court and it allows the parties to determine for themselves an acceptable level of risk. See Hanke v. American Intern. South Ins. Co., 782 N.E.2d 328, 332 (Ill. App. Ct. 2002) ("the public policy of the State of Illinois favor[s] the conservation of judicial resources through arbitration or appraisal").

In this case, the undisputed facts demonstrate that the parties established the appraisal process by which to determine the fair market value of the IAIS Common Stock and the Properties. The appraisal process assures that the fair market value of IAIS will be determined as it is currently operating, i.e. "as a going concern on a consolidated basis." Under the contract, then, RDC's business decisions relating to IAIS after it exercised its option and obtained control of the corporation would be beyond the scope of the appraisal determination.

16

Although the Court finds that RDC was under no obligation to disclose the economic terms of the non-binding letter of intent, even if such an obligation existed, Heartland has not demonstrated a genuine issue of material fact that would preclude summary judgment. Since Heartland's appraisal was the outlying number in the appraisal process, for Heartland to survive summary judgment on this Count (assuming that a disclosure obligation existed) it would have to produce some rebuttal evidence that either RDC's appraiser or the third appraiser or both would have considered the letter of intent during their appraisal process. RDC's appraiser, Banks, testified under oath at his deposition that his conclusions about the fair market value would have been unaffected by the disclosure of the economic terms of the non-binding letter of intent. (Banks Dep. Tr. 227–30.) The third appraiser, Poppei, swore that she would not have considered the non-binding letter of intent as part of her appraisal process because it was not a completed transaction. (Poppei Aff. ¶¶ 6–7.) Poppei further swore that her conclusions would not have changed even if she had considered the letter of intent. (Poppei Aff. ¶7.) According to the undisputed facts, it is unclear whether Heartland's own appraiser would have increased its appraisal if it knew the terms of the letter of intent.

Even if RDC were obligated to disclose the terms of the letter of intent, Heartland would have to provide some indication that the letter of intent would have altered the appraisal result under the contract. Neither of the critical two appraisers would have considered the terms of the letter of intent. Heartland cannot withstand summary judgment based on speculation alone.

Defendant is entitled to summary judgment on Count I of Plaintiff's Complaint. Plaintiff has not and cannot establish that RDC had a duty to disclose the terms of the non-binding letter of intent to the appraisers during the appraisal process. Furthermore, even if RDC had disclosed

the terms of the letter, the two appraisals that determined the fair market value under the terms of the contract between the parties would not have been materially altered by that disclosure. Defendant RDC's motion for summary judgment as to Count I is granted.

## C.    COUNT II of Heartland's Second Amended Complaint

Count II of Heartland's Second Amended Complaint seeks to invalidate the third appraisal because of Norman Carlson's alleged conflict of interest. The parties strongly dispute the nature and extent of Carlson's involvement with Poppei's appraisal. RDC contends that Carlson had only a limited role in providing Poppei with some expertise about the railroad industry. Heartland asserts that Carlson had a business interest in the outcome of the appraisal and that he was essentially in bed with RDC.

RDC asserts that Heartland was apprised of all the material elements of Carlson's relationship with it at the time it acceded to the appraisal. On this basis, RDC argues that Heartland waived any objection to Carlson's participation in the appraisal process. With respect to Count II, there are genuine issues of material fact which preclude a grant of summary judgment. The parties will have to establish at trial the nature and extent of Carlson's role in the appraisal process as well as his business interests, if any, in the outcome of the transaction between RDC and Heartland.

It remains distinctly possible that Heartland may have waived its objections to Carlson's role in the appraisal process when it agreed to permit him to consult with Poppei on the third appraisal. The Court cannot rule on that issue until the nature and extent of Carlson's role in the appraisal process and his relationship to RDC are established. Since the parties have genuine

disagreements of material fact about Carlson's relationship to RDC and his role in the appraisal process, summary judgment as to Count II must be denied.

### D.    COUNT III of Heartland's Second Amended Complaint

Count III of Heartland's Second Amended Complaint alleges that Poppei's appraisal, the third in the appraisal process, made significant fundamental mistakes in valuing IAIS. For almost a century, the Illinois courts have made it clear that "appraisers have wide discretion as to the methods and procedures they may follow in determining values." Board of Educ. of Chicago v. Gorenstein, 534 N.E.2d 579, 582–83 (Ill. App. Ct. 1989) (citing Sebree v. Board of Education, 98 N.E. 931, 935 (1912)). Unless the appraisers have committed fraud or egregious errors, their valuations will not be disturbed by the courts. Bailey v. Timpone, 389 N.E.2d 1193, 1196 (Ill. App. Ct. 1979).

The Court has reviewed the submissions of the parties relating to the fundamental errors that the third appraiser is alleged to have committed. None of these alleged errors, even if they were actually erroneous, are egregious enough to fall outside of the discretion that appraisers enjoy in Illinois when choosing methods and procedures to arrive at values. The Court will not circumvent the appraisal process the parties agreed upon to establish the fair market value of the corporation based upon these alleged errors. As a matter of law, these errors are insufficient to preclude summary judgment on Count III. See Board of Educ. of Chicago v. Gorenstein, 534 N.E.2d 579, 583 (Ill. App. Ct. 1989) ("[Plaintiff's] objections . . . to the cost approach used by the three appraisers . . . are not legally sufficient to preclude [Defendant's] summary judgment motion.").

## CONCLUSION

For the reasons set forth in this opinion, Defendant's motions for Summary Judgment as to Counts I and III of the Complaint and Second Amended Complaint are granted and Defendant's Motion for Summary Judgment as to Count II of the Second Amended Complaint is denied.

**Enter:**

David H. Coar
**United States District Judge**

**Dated: May 15, 2003**